Good morning, Your Honors. Jessica Agatstein, Federal Defenders. On behalf of Ms. Rodriguez, I'll plan... Excuse me. Oh, sorry. Would you please restart the clock? She's... Oh. Okay, so who are you arguing on behalf of? Yes, Ms. Rodriguez. Karla Rodriguez. Ms. Rodriguez. Okay. Proceed. Okay. So I'm Jessica Agatstein, Federal Defenders, on behalf of Karla Rodriguez. I'm going to take the first nine minutes. Counsel for Mr. Martins is going to take the remaining six. For myself, I'll plan to reserve a minute, and I'll watch my own clock. So in Ms. Rodriguez's sentencing, after she exercised her right to testify, the district court applied an obstruction adjustment absent of finding that the specific false testimony was on a material matter. And because of that, as well as the failure to explain and clear error issues, we'd ask this court to remand for resentencing. So on the obstruction guideline, any time a defendant exercises the right to testify, and that forms the basis of an obstruction enhancement, this court requires that the elements of perjury be found expressly. And that's giving false testimony and the falsehoods were willful and material. If it's based on perjury. Yes, that's correct. And I think, Your Honor, Judge Benninger, your question goes to whether this case falls more in the lines of the Flores line of cases or the... Perjury obstruction line of cases. So let me start out with where my main issue with your argument is that the testimony related, in part at least, to where she got the drugs, right? Right. And a drug dealer, I don't remember the town in where she lived. It was San Diego versus Mexico. Yes. Okay. So why, when we're dealing here with sentencing, the risk of death being foreseeable? Why wouldn't testimony about some known person knowing, you know where the drugs are and it's in your hometown, why wouldn't that make the risk of death less foreseeable than getting them from your brother in Mexico, an unknown supplier? They're strong, et cetera. Because her testimony called into question the whole thing about the text messages from the brother. They're strong. My chick says they're great. So why wouldn't that affect the sentence, that kind of testimony? Why wouldn't that relate to a matter that was materially at issue, this 25 level enhancement? Yeah, theoretically it could. However, the district court here said, I find whether she got them in Mexico or San Diego makes no difference. Makes no difference to the offense. Well, so that was post... Go ahead. I'm sorry. So he made that statement at an evidentiary hearing post plea. So that motion hearing went exclusively to whether to provide a departure or variance. So at that hearing, the only question was, I think, the question you're pointing out about the foreseeability, about how much the court should depart a variance. Right. And at page, I'm not sure if this is page 96 of the sentencing transcript. I apologize if that's not the ER site. That's okay. As I found the credibility of Ms. Rodriguez in particular wanting, it is true that it boded in the court's finding of the foreseeability of the misconduct leading to death. That was at the sentencing. Yes. I would point out a credibility finding being relevant is distinct from specific untrue testimony being material. And the specific untrue testimony being material is the element of perjury that's required to be found. This court is reversed for much stronger statements. Obviously, Judge Van Dyke and his concurrence in Sampson expressed a lot of frustration with that. It's an unpublished case, I think, both the government and the site. But it has done it, and even Judge Van Dyke recognized, he concurred, he didn't dissent, because he said, I don't agree with any of this, but we have to do it. Can you explain to me, I think you just took the position, but I may have misunderstood you, that where the drugs came from might have made it more foreseeable to her that death would result? Is that what you said? Theoretically, there's a, I mean, I don't know. Well, this is important on my scorecard. So was there any evidence in the record that the drugs coming from Mexico were more likely to be tainted? No. Was there any evidence about the amount of drugs, the origin of drugs that one might buy on the street in San Diego, and whether that might have been Mexico? Well, no, but for practical purposes, you know, it's very likely. So I'm trying to figure out what difference it made. And then, of course, we have the judge's statement that it doesn't matter. In this case, it clearly did not make a difference. On foreseeability, I understand the record to be that she testified that she'd done drugs with her boyfriend in the past, Martin, right? That's correct. He'd never given them away in the past. That's correct. She didn't know NAR until this evening, that fateful evening. That's correct. Her boyfriend told her that he was actually going back to the hotel to hand his dog off to a friend. Yes, and that's what happened. Knight didn't say he gave drugs to anybody else. What else should I be considering about foreseeability to her? It seems what the district court's reasoning was struck me as exactly right. You give drugs to an addict, and it's foreseeable that that person might die, but Martin's didn't die. It's NAR. How was it foreseeable these drugs would wind up in his hands? So there's no evidence in the record to suggest that. I think what the district court did was rely on intuition about what addicts should generally know. I think the subtext is what they should generally know about sharing pills, I suppose. But isn't the law that if you know death is foreseeable, it doesn't matter? If you know that the death of the person who died was foreseeable, if you know that it's foreseeable that if you distribute drugs, for example, to an addict, that there could be a death there, that that's enough for the enhancement? So this was a departure or variance that wasn't specifically, I'll say it wasn't specifically focused to one exact guideline. So I think what matters here is the district court's own reasoning rather than any specific law about the foreseeability to a third party. Your Honor, I might be referencing the mandatory minimum that statutory enhancement does not require a finding of foreseeability. But of course, the government, I think, correctly intuited that a 20-year sentence was not appropriate given that these folks were not dealers. I'd be happy to- Because the drugs were given away, is that? Yes, they were given away for free. Okay. If this court doesn't have any further questions, I'll reserve the remainder of my time. All right, thank you, counsel. Thank you. Your Honor, good morning, Gary Bersham. I represent Defendant David Martins. We're also challenging the sentence in this case, and in particular the 25-level 5K2.1 upward departure that the district court imposed in this case. Proximate cause is the issue in our claim as well. For a 5K2.1 upward departure to apply, aside from but-for cause, which we're not contesting in this case, the court has to find that it was foreseeable that the pills would have caused the death and also that the defendant, in this case, Mr. Martins, knowingly risked the death of NAR when he gave him the pills. He knew that he had a, he knew NAR was in treatment and had substance abuse history. Yes, Your Honor, he did. Was it three pills that he gave him? Correct, three pills. And he himself had consumed two that night? Correct. And thought they were strong? Yes. And did he observe before, is there evidence in the record that he observed, Mr. Martins observed that NAR was under the influence of something or other before he gave him the drugs? When he saw him that night at the motel, he thought he looked like he was intoxicated based upon overtaking his prescription, the gabapentin pills. And so that is something that Mr. Martins recognized. What I'm trying to, what I tried to focus on below, what I want this panel to focus on is the fact that when this happened in 2019, Mr. Martins had no idea that these pills could have contained fentanyl. 2024, this is a public health crisis. Tuesday of this week, May 7th, was National Fentanyl Awareness Day. The DEA's one pill can kill. 2023, 24, 2022, the danger of these pills is out there, and it should be. These pills are really dangerous. Literally one pill can kill someone, whether they're an addict or whether they're a high school kid at a party taking a pill for the first time. In 2019, it was different. In 2019, that was just the beginning of seeing the overdoses and the deaths from these pills. And Mr. Martins, when he was asked after he was arrested, and the same with Miss Rodriguez, they had never heard of fentanyl. And so, Mr. Martins, when he gave these pills to NAR, and when he took them himself, thought these were hydrocodone pills, which are the typical light blue M30 pills. But he knew, or at least there's evidence that he knew, her brother said they were good. Correct. And that goes to, and the question about, your honor had about geographically, where did these pills come from? Is that important? I don't think geographically it is. What's important is these were non-pharmacy, non-prescription pills. And when- Are they apparent? I don't know how they looked, why that would have been apparent. If you're buying them on the street, that doesn't mean they didn't come from a pharmacy. Well, we're assuming they didn't come from, well, they didn't come from a U.S. pharmacy. I'm just referring to, I'm not trying to be cute. It's just, you know, so often we see cases where somebody's stolen pharmacy pills out of a medicine cabinet or out of a purse or something. So I don't know. These pills were described as being blue and having a little stamp on them. It sounded to me like they might have looked like they had been from a pharmacy. The point I'm trying to make is that the fact that these pills were different in strength suggests that these were not legitimate pills from Pfizer or Merck or one of the pharmaceutical companies. These pharmaceutical-grade pills don't differ in strength. The pills are all the same. And the fact that these pills seem stronger than the last ones that he had taken suggests that these were pills not from a legitimate pharmacy, not from a legitimate source. And, but that doesn't change the fact that Mr. Martens... So Mr. Martens took two pills before he gave the three to NAR? That's correct. And nothing, he didn't, he felt stronger, but he didn't die. No, he had no adverse effects. Did the text say they were stronger? It said they were strong and too deep. Basically, if you take two, they were strong. Okay. And I want to circle back just to the, I think, I think to the fact that it's really most important for this determination is that he had no inkling, no idea that these pills were not, they would contain a completely different substance than hydrocodone. And they would be 50 or 100 times more powerful than morphine, which is what fentanyl is. And so he would never have given NAR these pills if he had, if he was practically certain that he could risk his good friend's death by doing so. There was an evidentiary hearing, and I think toxicologists testified about what the actual cause of death was and so forth. And then a finding by the trial court. Was there testimony there that if the pills had been what your client thought they were, that death couldn't have resulted from taking three of them? There was no testimony as to whether, if these were hydrocodone pills, that they would have been fatal. There was nothing in the record suggesting that if these had not, these pills had not contained fentanyl, that NAR would have died. There were statements that were made, I think, after the arrest suggesting that maybe they thought they were sex pills. There was some deflection. You know, Mr. Martin, he was scared, he was scared. I mean, he gave his friend a pill, and it killed him. So I asked a slightly different question than the one you answered, which is, was there testimony at that evidentiary hearing, or any evidence, that if the pills had been what your client thought they were, that death would not have resulted? I don't believe there was on that specific point, no, Your Honor. I believe there was not. I'd like to reserve a minute for rebuttal, if possible. All right. Thank you very much. Good morning again. May it please the Court, Zach Howe on behalf of the United States. The District Court did not plainly err in applying an obstruction of justice enhancement here. For one, this Court has never required explicit findings outside the context of perjury, and as the notes to the guidelines note, there are other grounds for providing false statements to the Court and officers that are separate from the perjury-based obstruction enhancement. So I don't think it could be plainly erroneous to not require express findings here when Rodriguez provided false statements to the Court and provided false statements to officers before trial. So perjury wasn't the only grounds for an enhancement. Is there any basis for finding that the fact that the drugs came from Mexico and not from San Diego, adjacent to Mexico, made the risk of death any more foreseeable? No, and we haven't relied on that. And I think the Court's statement at page 77 of the record that it didn't make a difference whether they were from San Diego or Mexico kind of forecloses that avenue to us. I think the grounds for foreseeability here relate to the deflections about the text messages. So as I take Rodriguez's testimony, she's saying she gave opiates to Rodriguez, but that those opiates were not the pills she was referring to in her text messages. She's saying all of those discussions were just about sex pills.  I think page 38, for example, of the record, the Court makes the finding that the blue pills are the sex pills and that the blue pills are the oxy and not the sex pills. Of course, what's being referred to in the text messages is the blue pills. So I think the Court's saying that's referring to oxy and not the sex pills. So I'm trying to make sure that we're talking about foreseeability, but I think we're really on the topic of obstruction. Yes. Okay, and so if we don't have a finding of materiality, and I think that there's an argument to be made about whether that was necessary here, I'm trying to figure out what your response is. We have an indication from the judge that he thinks that that statement wasn't material, right? At least the statement about the origin of the drugs was not material. And I agree with that. So are you relying on—I think I understood that you agreed with that part. So are you relying on support for the obstruction enhancement, a different misstatement that she made? Yes, and I think I said foreseeability and not materiality. Okay, thank you. So what I'm relying on—sorry about that. That's all right. So what I'm relying on is—and what I think the Court was relying on was the lies about the nature of the text messages. And you think that supports the obstruction? Yes, and the reason is that you have these text messages where Martins discusses the blue pills with Rodriguez, and then shortly after, Martins discusses the pills with NAR, and he describes them as strong and too deep. And he also says, my chick, referring to Rodriguez, said they're the opposite of last time and that they're good. So in other words, last time they were bad, this time they're good. That's what Rodriguez is telling me. That's material because it indicates that if those text messages really are about the pills that Rodriguez gave to Martins, then she knows that they're good, they're the opposite of last time, and that obviously is material to whether she would foresee that they could cause death. Okay, I think I understand your answer to the obstruction count or enhancement, but I think we were just getting into foreseeability, and for me this is a really steep hill for the government to climb. Because it seems to me foreseeable that Martins may have gotten into trouble, but you heard me go through the facts that you know very well about Rodriguez where she said he'd never given them away before. He actually lied to her about why he was meeting that night because he told her there was a need to hand off a dog and so on and so forth. So why was it foreseeable to her that these drugs would be given to anyone else? So our position below is not that it was foreseeable that Martins would give the pills to NAR. We do have an argument in our brief that to the extent the court found that, and I don't think it did, but if it did, I think it would just come down to a credibility determination that wouldn't necessarily be clearly erroneous. But I think we all agree that the court ultimately isn't finding that she foresaw that Martins would give the pills to NAR. What the court is finding is just that regardless of whether you foresaw that the pills would be given to someone else, there is still a foreseeable risk of death when you are giving pills to an addict who, and this is by our own testimony at 368 through 72, he is an addict who has been kicked out of rehab. He sometimes takes up to 30 pills a day. The brother. She had to ration the number of pills she gave him. You're talking about the brother. I'm talking about Rodriguez's testimony about Martins. So this is the person who she's giving the pills to. She knows he has no stop signs, and I think the cases we cite at page 38 and 39 of our brief indicate that even if you don't know the particular person who ends up dying, if you're giving drugs to an addict, there is still a foreseeable risk of death. Do you think she was giving hydrocodone? I believe oxycodone. Oxy, forgive me, oxy. And she gave him 10, Martins 10, she said, because she thought he didn't have a stop sign. I remember reading that part of the. So you think because she gave 10 to an addict, it was foreseeable that somebody would die? Yeah, and one correction, I apologize. I think she actually didn't specify oxycodone. I think she specified opiates. So she knew she was giving him opiates. I'm not sure if she said she knew she was giving him oxycodone. But then to your question, yes, I do think if you are giving 10 pills to someone who you know has no stop signs, then there is a, who is an addict, there is a reasonable, a foreseeable risk of death, even if the person who ultimately dies isn't the person taking the drugs. What's your strongest authority for that point, that it needed to be, it didn't need to be Martins, it could have been foreseeable, or sufficient, sorry, that it should have been foreseeable to her that he might give them to someone, even though he never had before? Sure, so there are two strands of cases we cite at page 38 and 39 of our brief. The cases on page 38 relate to when, some of them are conspiracy cases, you know, when you're in a drug conspiracy and drugs get given to an addict. It's seldom the case that all of the co-conspirators foresee which addict is ultimately going to be the one who dies, and yet courts have found foreseeability in that instance. The other strand of cases we cite relate to the departure provision more generally, and in those cases, courts have found foreseeability even when the death, the manner of death, has been frankly pretty attenuated from what was going on in the case. So to give some examples, in Montgomery, the defendant illegally possessed a gun, and his wife used that gun to commit suicide, and the court said a departure was appropriate there. In Sheetz, a co-conspirator shot someone while they were collecting drug debts, and the court said the other co-conspirator could foresee the death. In Purchase, a drug courier was ordered by the defendant to swallow drug packages, and they burst in the courier's stomach. The court said there was foreseeability there. In Davis, the Fifth Circuit said that during an armed robbery, when the teller died not from being shot but from a brain aneurysm, that death was foreseeable there. So ultimately, I think this really just comes down to was it clearly erroneous for the district court to conclude that there was foreseeability in those circumstances, and I think all those authorities support our position. But even if you were to disagree with that, this all goes to the departure, but ultimately the court just reviews the overall sentence for substantive reasonableness, and in the 3553A analysis, even lacking some sort of strict definition of foreseeability, the district court, I think, is entitled to vary, given that you have a very tragic death and that you have, in Rodriguez's case, someone giving very strong drugs to a, well, I'll say drugs that she knows to be good and the opposite of last time to a known addict with no stop signs and given her dishonest statements. I don't think a 75-month sentence is unreasonable in that circumstance, and for Martins, who is directly giving them to an addict in rehab who is high at the time and ultimately, tragically, passes away, that a 72-month sentence is unreasonable. It seems to me that you're jumping to substantive reasonableness. I understood that the decision tree is the first, we're really looking at the first calculation of the guidelines. We start there, of course, and there's this question about the 25 points, the points that were added right up on the front end, and that depends upon a foreseeability finding, doesn't it? I agree with that, but this court has said in Lichtenberg and Meltzer and other cases that post-Booker it doesn't review the procedural correctness of departures. So ultimately, even if you were to find that there's an error in the fact-finding relating to foreseeability for the departure, then you still have to analyze the overall sentences to ask if they're substantively reasonable. I agree, and I'm not trying to be difficult, but I am trying to make sure we're not having a miscommunication. Before you get there to the departure, we have to figure out whether you started with the correct number, and there has to be a justification for plugging in 25 points. And I think that is dependent upon, that's my understanding, that's dependent upon the judge's foreseeability finding. Do you analyze that differently? So for departures, they ultimately roll into the 3553A analysis because it's different than calculating other adjustments that actually go into the guidelines calculation. Pre-Booker, the departure would have been mandatory, and so then you would review it for procedural correctness. Here, the court, if you were to find error in the departure, then you wouldn't simply say we reversed because the court miscalculated the guidelines because, again, the departure is no longer mandatory post-Booker. It would just be part of the substantive reasonableness analysis. I see. So the answer to my question is yes. I believe so, yes. That's correct. Thank you. So I have a few minutes left. I wanted to just, if I could, return and say a few more words about obstruction. The ground I gave you for affirming was that the court doesn't have to make explicit findings for non-perjury-based enhancements. Even if you were to find that the court could only have made this enhancement based on perjury in this case, there is an intra-circuit split as to whether you need express findings as to willfulness and materiality or not. I absolutely take my friend on the other side's point that you have Castro-Ponce and you have Herrera-Rivera and other cases saying you do need express findings, but for every one of those, I can point you to two or three published cases from this court saying you don't need express findings. I've jotted down eight published opinions that say that. I appreciate those authorities that you've cited, but do any of those cases include the statement that we had here affirmatively from the court that indicated that the statement regarding source wasn't material? I don't think so, and if that was all that we had, then I would agree you should reverse because you have an affirmative finding of a lack of materiality. But here I think the court's statements that... Well, two sets of statements. One is that it says that it agrees that these blue pills that she's talking about are the oxy and not the sex pills. That's a finding of the nature of the lie, so it's saying that's a lie about the text messages. That, coupled with the finding that it does find that her credibility factored in its foreseeability determination, I think necessarily covers materiality and willfulness because, of course, if these lies were completely accidental or if they were completely immaterial, then they would have had nothing to do with foreseeability. They couldn't possibly have affected whether she would have foreseen the risk of death. Did the district court say it was only relying on statements to the district court, or did the district court leave open, by the general nature of the comments, about statements to law enforcement? As I read it, the court doesn't parse it one way or the other. I don't see it either. I will say the PSR, in requesting the obstruction enhancement, mentions these statements to officers, and the government, in its sentencing pitch, doesn't expressly mention statements to officers, but it does say that Rodriguez has been dishonest since the beginning of the case, suggesting the statements to officers. Doesn't the government's sentencing memo explicitly invoke perjury? At the evidentiary hearing, didn't the AUSA state, I think the reason we are recommending a higher sentence for Ms. Rodriguez is because we believe she perjured herself during the evidentiary hearing. Yes. Doesn't that trigger Caster Ponce? I think that's the page after the government says that she's been dishonest since the beginning of the case. So I absolutely agree we mentioned perjury on that page. The court ultimately doesn't mention perjury at any point. So, again, I think it's open that the court was not relying strictly on perjury. But, again, even if you find that this was a perjury— I'll be using more that we should require explicit findings from the district court so we know what the court's actually ruling. Well, Your Honor, I'll simply say that even if you find this had to be or was a perjury-based enhancement, when you have an intra-circuit conflict as to whether you need express findings for a perjury enhancement, then it can't be plainly erroneous to side with one side of the split as opposed to another. And so I see I'm out of time. Actually, I may have 30 seconds. The last point I'll make is even if you were to find that there were an error as to the obstruction of justice enhancement, I think you should find that there is no prejudice here because given that the court says this voted in my foreseeability determination, it's clear that if you were to remand, the court would essentially just say, and thus I find it material and willful. It wouldn't change the court's determination. So I don't think they can show a reasonable probability of a different outcome on remand. Thank you. Hi. So I'll start with the government's suggestion about the facts. I think the district court did find that Ms. Rodriguez foresaw that NIR would take the pills, and I think that was clear error. And I'll point the court toward ER 38 where it says the misconduct leading to death was foreseeable to Ms. Rodriguez. I think that is, for the reasons we've discussed, I think that was a clear error. I will also say in response to the government's point, this court does review any fact-finding supporting sentencing, whether a departure or a variance. The court did both. Reviews it to make sure there is a factual basis for that finding. And that's GAL related to the failure to explain point. GAL says the larger the departure, the more the explanation is needed. I'm sorry to interrupt your rebuttal. What lines on page 38 are you referencing? Yes. So I am looking at lines 4 through 6 on 38. Which page are you looking at? ER 38, 1 ER 38, lines 4 through 6. It says it is true that that boated into the court's finding of the foreseeability of the misconduct leading to death. We're talking about Ms. Rodriguez specifically. It's a little hard to parse, which is why I agree this court has the express findings requirement when it comes to obstruction. One other point I'll say is that I think many of the foreseeability cases the government cites and discussed with you all involve cases where the defendant was aware of who the possible victims would be. A husband having a gun would know that his wife might have access to it in the same home. And here the facts are pretty different and very unusual, I'll say. And then finally on the plain error point, we did specifically request that the court find that the statement was not material. That's in our objection to the PSR at 2 ER 105. Unless the court has any further questions. Thank you, counsel. Mr. Burcham? Your Honors, unless the court has any questions, I'm prepared to submit the matter for Mr. Martins. All right. Okay. United States v. Rodriguez is submitted. And this court is in recess for this week. Thank you. All rise. This court for this session stands adjourned.
judges: WARDLAW, CHRISTEN, BENNETT